UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: _____

**JILL KUTNER**,

    Plaintiff,

v.

**BAPTIST HEALTH SOUTH FLORIDA, INC.**, an active Florida corporation; and **DOCTORS HOSPITAL, INC.**, an active Florida corporation,

    Defendants.
_____ /

## COMPLAINT

Plaintiff, JILL KUTNER ("Jill"), through her counsel, files her Complaint against Defendants, BAPTIST HEALTH SOUTH FLORIDA, INC., an active Florida corporation and DOCTORS HOSPITAL, INC., an active Florida corporation (collectively "Defendants").

**PARTIES, JURISDICTION, VENUE & CONDITIONS PRECEDENT**

1. This is an action for damages by Plaintiff against Defendants arising under Title I of the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq*. (the "ADA") and the Florida Civil Rights Act, Fla. Stat. § 760.01 *et seq*. (the "FCRA").

2. Jill is an individual who is over the age of eighteen (18), is *sui juris* and is a resident of Miami-Dade County, Florida.

3. Defendant, Baptist Health South Florida, Inc. is an active Florida corporation whose principal place of business is in Miami-Dade County, Florida.

4. Defendant, Doctors Hospital, Inc. is an active Florida corporation whose principal place of business is in Miami-Dade County, Florida.

5. Upon information and belief, at all material times Jill was employed by both Defendants as joint employers in Miami-Dade County, Florida.

6. This Court has personal jurisdiction over the Defendants because they engage in continuous and systematic business contacts within the State of Florida and maintain a substantial physical presence in the State of Florida, including the operation of their corporate headquarters in Miami-Dade County, Florida.

7. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(4), as this is an action brought pursuant to the ADA.

8. The Court has supplemental jurisdiction over Plaintiff's claims under the FCRA, as these claims arise out of the same operative facts as Plaintiff's ADA claims, and together, form part of the same case or controversy.

9. Venue is proper in the Southern District of Florida, in this division, because a substantial part of the events (including discriminatory practices) giving rise to Plaintiff's claims occurred within this District and Division.

10. Venue is further proper in this District because the Defendants are subject to personal jurisdiction herein by virtue of their substantial, continuous, and systematic commercial activities in this District. *See* 28 U.S.C. § 1391(b), (c). Defendants are subject to personal jurisdiction in this Division and therefore "resides" in this Division for venue purposes. *See* 28 U.S.C. § 1391(c)).

11. All conditions precedent to the filing of this lawsuit have occurred, have been waived or have been performed, including but not limited to Plaintiff exhausting her administrative remedies by complying with the statutory prerequisites of filing a timely charge of discrimination against the Defendants with the United States Equal Employment Opportunity Commission

("EEOC") and the Florida Commission on Human Relations ("FCHR").

12. Specifically, on August 4, 2022, Jill dual filed her Charge of Discrimination with the EEOC and the FCHR .

13. On March 4, 2023, the EEOC issued Jill her Dismissal and Notice of Rights ("Right to Sue"). A copy of the Right to Sue is attached as **Exhibit A**.

14. This lawsuit has been timely filed within ninety (90) days of Jill's receipt of the Right to Sue.

15. Further, more than One Hundred and Eighty (180) days have passed since the filing of Jill's Charge of Discrimination, which was dual filed with the EEOC and the FCHR.

16. The FCHR did not issue any determination concerning Jill's Charge.

17. As a result, pursuant to F.S. §760.11(18), which provides that if the FCHR fails to conciliate or determine whether there is reasonable cause on any complaint under that section within 180 days of the filing of the complaint, an aggrieved person may file a civil action "as if the commission determined that there was reasonable cause."

18. Therefore, Jill exhausted all administrative remedies under Florida as well as Federal law.

## FACTUAL ALLEGATIONS

19. Jill was an approximately twenty-seven (27) year employee of Defendants.

20. Jill physically worked at Doctor's Hospital ("DH") which is a hospital that is part of a network of hospitals owned and operated by Defendant, Baptist Health South Florida, Inc. ("Baptist Health").

21. The Defendants were joint employers.

22. Specifically, both Defendants exercised dominion and control over Jill.

23. Jill's paychecks and W2s show Baptist Health as her employer.

24. However, Jill performed all her work at DH, and was supervised by persons who also performing their work at DH.

25. Thus, Defendant Doctors Hospital, Inc. also benefitted from Jill's services and exercised dominion and control over Jill.

26. Accordingly, the Defendants jointly were Jill's employer.

27. Jill was employed by Defendants as a Social Work Case Manager ("SWCM").

28. Jill worked most of her career for Defendants at DH in the social work case management department as a supervisor.

29. During the entirety of her employment, Jill always received "exceeding expectations" on her performance evaluations.

**The SWCMs and How They Functioned At DH**

30. As a SWCM, Jill's job was to assess patients to identify patient/family psychosocial and environmental needs related to hospital admissions, diagnosis, treatment, and discharge needs.

31. During the time of Jill's employment, there were a total of nine (9) SWCMs at DH.

32. Certain units of DH have an assigned SWCM.

33. Units that do not have an assigned SWCM use a Rotational Social Work Case Manager ("RSWCM").

34. The RSWCM is usually a SWCM assigned to a specific unit, but they essentially cover their unit and those units that do not have an assigned RSWCM.

35. The units of DH are as follows: (1) the Emergency Department (which is the Emergency Room) ("ED"); (2) the Observation Unit ("OU"); (3) the Intensive Care Unit ("ICU"); (4) the Critical Care Unit ("CCU"); (5) the Medical Surgical Unit ("MSU"); (6) the Orthopedic

Unit ("OU"); and (7) the Telemetry Unit which also serves as the COVID Unit ("COVID Unit").

**Jill's Disability and Her Reasonable Accommodation**

36. In 2001, Jill was diagnosed with IGA Deficiency ("IGA").

37. Jill's IGA causes her to have a physical impairment as defined by 29 C.F.R. § 1630.2(h)(1) (she has a physiological disorder affecting her immune system) and is substantially limited in a major life activity as defined by 29 C.F.R. § 1630.2(i)(1)(ii) (the operation of her immune system).

38. IGA is a clinical primary immune deficiency disorder, making Jill a qualified individual with a disability under the ADA and FCRA.

39. Jill informed Defendants of her IGA when she was diagnosed with IGA in 2001.

40. In 2001, Defendants provided Jill a reasonable accommodation for her IGA.

41. The reasonable accommodation was that: (1) Jill could stay out of patient isolation rooms and any area that is a high risk for infectious, transmittable diseases; and (2) for patients in those areas, she could complete their evaluations by phone.

42. Jill's reasonable accommodation continued until March 18, 2022.

**Jill's Reasonable Accommodation Is Revoked and Then She is Denied A Reasonable Accommodation**

43. On March 18, 2022, Jill was working as a RSWCM.

44. Jill's assignment that day was to cover the COVID Unit.

45. Patient assessments for patients in the COVID Unit were done by telephone.

46. On that date, she was assigned to assess a patient located in the ED.

47. Per her reasonable accommodation, which was allowed by Defendants from 2001, Jill assessed the patient by telephone.

48. Jill informed her direct supervisor, Mansur Budejen, that she was conducting the

patient assessment via telephone.

49. Budejen did not object.

50. Despite her existing reasonable accommodation, Pascale Francis ("Francis"), the Director of Case Management, who was Budejen's supervisor, demanded that Jill see the patient in person.

51. Jill told Francis that she did not feel safe going to the ED.

52. Specifically, Jill told Francis: (1) about her IGA diagnosis; (2) that due to her IGA diagnosis, she is uniquely susceptible to infectious diseases; (3) that Defendants have known about her IGA diagnosis since 2001; and (4) that Defendants, as an accommodation for her IGA diagnosis, have always allowed her to perform telephone assessments of patients located in areas that are a high risk for infection.

53. Francis did not care.

54. Francis told Jill the following: (1) that she "cannot make an exception for [Jill];" (2) that Jill was being insubordinate; (3), that she (Francis) was going tell Human Resources about Jill's insubordination; and (4) that Jill would need to bring her issues to Defendants' Employee Health Department.

55. On March 18, 2022, Jill spoke to Deborah Diamond ("Diamond"), who is Defendants' Employee Health ARNP.

56. Jill informed Diamond the same things she had told Francis concerning her IGA diagnosis, Defendants' knowledge of that diagnosis since 2001, the prior accommodation that had been given, and that the need for this accommodation remained.

57. Diamond told Jill to provide a letter from her doctor and ask for an accommodation.

58. On March 24, 2022, Jill was the SWCM assigned to DH's Orthopedic Unit.

59. On that date, Jill assessed by phone, a patient located in the ED.

60. Francis asked Jill if she went to see the above-referenced patient in person.

61. Jill again told Francis that she did not feel safe going to that the ED considering her IGA diagnosis.

62. Francis again told Jill that she was being insubordinate.

63. On April 22, 2022, Jill provided a letter from Katherine Eiserman-Rogers, M.D. ("Doctor Rogers"). A copy of Doctor Rogers' letter is attached as **Exhibit B**.

64. Therein, Doctor Rogers: (1) confirms Jill's IGA diagnosis; (2) confirms that because of her susceptibility to infections, Jill requires an accommodation which is to not interact face-to-face with patients in high-risk areas of DH; and (3) that the accommodation in the letter was previously provided and was never a problem. *See* Exh. B.

65. On April 25, 2022, Jill spoke with Diamond, who confirmed receipt of Doctor Rogers' letter.

66. Jill again formally requested a reasonable accommodation that she be able to continue to perform her job, as she had done for the prior approximately twenty (20) years, by talking on the phone to patients who were in high-risk areas of DH.

67. On April 25, 2022, Defendants denied Jill's request for a reasonable accommodation.

68. On that same date, Defendants placed Jill on leave without pay.

69. Being placed on leave without pay was an adverse employment action.

70. As of the filing of this Complaint, Jill has: (1) not been allowed to return to work; (2) has not been paid; (3) has lost her health insurance; and (4) has lost all other employment benefits.

71. Seeing patients in person is not an essential function of the job of a SWCM.

72. Other SWCMs were and currently are allowed to assess patients via telephone and/or telehealth.

73. As per the Job Description of the SWCM, there is no requirement to see patients in person.

## COUNT I
## VIOLATION OF THE ADA
### (Failure to Accommodate)

74. Plaintiff incorporates and re-alleges paragraphs 1 thorough 73 above as if fully set forth herein.

75. At all relevant times, the Defendants were, and continue to be Jill's employer within the meaning of the ADA.

76. Jill is a qualified individual with a disability.

77. Specifically, Jill has a physical impairment as defined by 29 C.F.R. § 1630.2(h)(1) (she has a physiological disorder affecting her immune system) and is substantially limited in a major life activity as defined by 29 C.F.R. § 1630.2(i)(1)(ii) (the operation of her immune system).

78. Jill can perform the essential functions of her job with a reasonable accommodation.

79. First, as explained above, Jill was performing the essential functions of her job for approximately twenty (20) years with the above-described accommodation.

80. Second, there are other SWCMs who have been granted, and currently have, the same reasonable accommodation that Jill previously had and again requested.

81. Defendants revoked Jill's reasonable accommodation with no explanation and did not engage in an interactive process prior to taking their adverse employment action.

82. Upon revoking Jill's reasonable accommodation and then denying her renewed

request for the same reasonable accommodation that she had for the prior twenty (20) plus years, Jill was placed on leave without pay, where she remains.

83. This constitutes an adverse employment action.

84. Moreover, Jill has lost all employment benefits.

85. Jill has suffered damages, including loss of pay, loss of her employment benefits and emotional distress.

WHEREFORE, Jill demands judgment against Defendants for actual damages, back pay, front pay, punitive damages, compensatory damages, other compensation lost to her as a result of Defendants' discrimination, prejudgment interest, reasonable attorney's fees and costs and any such other relief allowed under the ADA that this Court deems just and appropriate.

## COUNT II
## VIOLATION OF THE ADA
## (Retaliation)

86. Plaintiff incorporates and re-alleges paragraphs 1 thorough 73 above as if fully set forth herein.

87. At all relevant times, the Defendants were, and continue to be Jill's employer within the meaning of the ADA.

88. Jill engaged in protected activity when she informed Defendants (through Budejen and Francis on March 18, 2023 and Diamond shortly thereafter) that: (1) she suffered from a disability; (2) Defendants had known of the disability since 2001; (3) Defendants had previously provided Jill with a reasonable accommodation; and (4) she continued to need the reasonable accommodation due to her disability.

89. Instead of engaging in the interactive process, Jill was told that she was insubordinate.

9

90. The foregoing happened again on March 24, 2022, culminating in Jill being placed on leave without pay.

91. Being placed on leave without pay is an adverse employment action.

92. To that end, Defendants intentionally and directly retaliated against Jill for engaging in protected activity.

93. There is a causal connection between Jill's protected activity and the adverse action insofar as, among other things, there is temporal proximity between the protected activity and her being placed on leave without pay and losing all her employment benefits.

94. As a proximate result of Defendants' conduct, Jill suffered damages, including loss of pay, loss of her employment benefits and emotional distress.

WHEREFORE, Jill demands judgment against Defendants for actual damages, back pay, front pay, punitive damages, compensatory damages, other compensation lost to her because of Defendants' discrimination, prejudgment interest, reasonable attorney's fees and costs, any other relief allowed under the ADA and any other relief that this Court deems just and appropriate.

## COUNT III
## VIOLATION OF THE FCRA
### (Failure to Accommodate)

95. Plaintiff incorporates and re-alleges paragraphs 1 thorough 73 above as if fully set forth herein.

96. At all relevant times, the Defendants have been, and continue to be Jill's employer within the meaning of the FCRA.

97. Jill is a qualified individual with a disability.

98. Specifically, Jill has a physical impairment as defined by 29 C.F.R. § 1630.2(h)(1) (she has a physiological disorder affecting her immune system) and is substantially limited in a

major life activity as defined by 29 C.F.R. § 1630.2(i)(1)(ii) (the operation of her immune system).

99. The disability portion of the FCRA is patterned after the ADA.

100. Therefore, federal regulations that are applicable to the ADA are applicable to the FCRA as well.

101. Jill can perform the essential functions of her job with a reasonable accommodation.

102. First, as explained above, Jill was performing the essential functions of her job for approximately twenty (20) years with the above-described accommodation.

103. Second, there are other SWCMs who have been granted, and currently have, the same reasonable accommodation that Jill previously had and again requested.

104. Defendants revoked Jill's reasonable accommodation with no explanation and a complete failure to engage in any interactive process.

105. Jill suffered an adverse employment action.

106. Upon revoking Jill's reasonable accommodation and then denying her renewed request for the same reasonable accommodation that she had for the prior twenty (20) plus years, Jill was placed on leave without pay, where she remains.

107. This constitutes an adverse employment action.

108. Moreover, Jill has lost all employment benefits.

109. Jill has suffered damages, including loss of pay, loss of her employment benefits and emotional distress.

WHEREFORE, Jill demands judgment against Defendants for actual damages, back pay, front pay, punitive damages, compensatory damages, other compensation lost to her because of Defendants' discrimination, prejudgment interest, reasonable attorney's fees and costs, any other relief allowed under the FCRA and any other relief that this Court deems just and appropriate.

## COUNT IV
## VIOLATION OF THE FCRA
### (Retaliation)

110. Plaintiff incorporates and re-alleges paragraphs 1 thorough 73 above as if fully set forth herein.

111. At all relevant times, the Defendants have been, and continue to be Jill's employer within the meaning of the FCRA.

112. Jill engaged in protected activity when she informed Defendants (through Budejen and Francis on March 18, 2023 and Diamond shortly thereafter) that: (1) she suffered from a disability; (2) Defendants have known of the disability since 2001; (3) Defendants have previously provided Jill with a reasonable accommodation; and (4) she continued to need the reasonable accommodation due to her disability.

113. Instead of engaging in the interactive process, Jill was told that she was insubordinate.

114. The foregoing happened again on March 24, 2022, culminating in Jill being placed on leave without pay.

115. Being placed on leave without pay is an adverse employment action.

116. To that end, Defendants intentionally and directly retaliated against Jill for engaging in protected activity.

117. There is a causal connection between Jill's protected activity and the adverse action insofar as, among other things, there is temporal proximity between the protected activity and her being placed on leave without pay and losing all her employment benefits.

118. As a proximate result of Defendants' conduct, Jill suffered damages, including loss of pay, loss of her employment benefits and emotional distress.

WHEREFORE, Jill demands judgment against Defendants for actual damages, back pay, front pay, punitive damages, compensatory damages, other compensation lost to her because of Defendants' discrimination, prejudgment interest, reasonable attorney's fees and costs, any other relief allowed under the ADA and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts and issues so triable.

Respectfully submitted,

By: /s/*Michael L. Elkins*
Michael L. Elkins, Esq.
Florida Bar No. 523781
melkins@mlelawfirm.com
**MLE LAW**
1212 Northeast 16th Terrace
Fort Lauderdale, FL 33304
Telephone: 954.401.2608
*Co-Counsel for Plaintiff*

By: /s/*Joshua M. Entin*
Joshua M. Entin, Esq.
Florida Bar No. 0493724
josh@entinlaw.com
**ENTIN LAW GROUP, P.A.**
1213 SE 3rd Ave.
Fort Lauderdale, Florida 33301
Tel: 954.761.7201
*Co-Counsel for Plaintiff*